

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

## NO. PD-1184-16

### RICHARD CHARLES OWINGS, JR., Appellant

### v.

### THE STATE OF TEXAS

### ON STATE'S PETITION FOR DISCRETIONARY REVIEW
### FROM THE FIRST COURT OF APPEALS
### HARRIS COUNTY

**WALKER, J., filed a concurring opinion.**

### <u>CONCURRING OPINION</u>

I agree with the Court's decision to reverse the judgment of the court of appeals and remand the case for further proceedings. However, I write separately to give greater depth to the harm analysis, especially because some of the purposes served by the election rule may seem obtuse to the uninitiated.

When a trial court errs by failing to require the State to elect, the error is constitutional and subject to harmless error analysis. *Phillips v. State*, 193 S.W.3d 904, 914 (Tex. Crim. App. 2006). Furthermore, for election cases, our harmless error analysis requires examining the four purposes

underlying the election requirement and how the defendant might have been harmed by the lack of a proper election to serve each of those purposes. *Dixon v. State*, 201 S.W.3d 731, 734-36 (Tex. Crim. App. 2006). Those purposes are:

- to protect the accused from the introduction of extraneous offenses;
- to minimize the risk that the jury might choose to convict, not because one or more crimes were proved beyond a reasonable doubt, but because all of them together convinced the jury the defendant was guilty;
- to ensure unanimous verdicts; that is, all of the jurors agreeing that one specific incident, which constituted the offense charged in the indictment, occurred;
- and to give the defendant notice of the particular offense the State intends to rely upon for prosecution and afford the defendant an opportunity to defend.

*Phillips*, 193 S.W.3d at 909-10. Our constitutional harm analysis thus requires us to determine whether we are convinced beyond a reasonable doubt that in none of those ways the election error contributed to the defendant's conviction or punishment. *See Dixon*, 201 S.W.3d at 736. Accordingly, we must determine that the error did not:

- impair the defendant's protection from the introduction of extraneous offenses;
- increase the risk that the jury wrongfully convicted the defendant because of the evidence of all of the events together, and not because one or more crimes were proved beyond a reasonable doubt;
- endanger the defendant's right to have the jurors reach a unanimous verdict on the specific incident that constituted the offense of which the defendant was convicted; or
- deny the defendant notice of the particular conduct the State relied upon as constituting each offense and an adequate opportunity to defend against the allegation that the defendant engaged in that conduct.

*See id.* at 734-36.

### I - Protection from the Introduction of Extraneous Offenses

To the unfamiliar, the first purpose of the election requirement seems contradictory. The time for a defendant to request election is at the end of the State's case in chief. *Crosslin v. State*, 235 S.W. 905, 906 (Tex. Crim. App. 1921); *O'Neal v. State*, 746 S.W.2d 769, 772 (Tex. Crim. App.

1988); *Phillips*, 193 S.W.3d at 909. At this point in the proceedings, the State may have already presented the extraneous offense evidence to the jury.[1] How can an election of offenses by the State protect a defendant from extraneous offense evidence after the State has already put that evidence before the jury during its case in chief? The "harm," so to speak, has already been done. The State rang the bell, poisoned the well, and put the skunk in the jury box. The fact that a defendant has committed other offenses is not a fact a jury can easily forget.

While the jury may be unable to forget, the trial court can instruct the jury to consider the extraneous offense evidence, not as evidence of guilt of the charged offense, but for other limited purposes. This is the "protection" contemplated by the first purpose underlying election. How can a court know which evidence is extraneous, and thus which evidence should a defendant be "protected" from via a limiting instruction, until the State has elected which offense it will proceed upon?

 "Protection" under the first purpose is probably a misnomer. A limiting instruction does not keep a defendant safe from extraneous offense evidence. It does not guard against or prevent the evidence from being presented. Instead, the "protection" is a mitigating measure–it blunts or softens the damage done by the already presented extraneous offense evidence by instructing the jury that the evidence is to be considered for limited purposes.

That being said, did the error impair Appellant's "protection" from the admission of evidence

---

[1] Extraneous offense evidence is admissible for purposes other than proving character, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident. Tex. R. Evid. 404(b)(2). Additionally, in cases involving sexual abuse of a minor such as this one, evidence of other bad acts committed against the same child who is the victim of the alleged offense is admissible to show the defendant's state of mind, the relationship between the defendant and the child, and, in aggravated sexual assault cases such as the one before us today, to prove character. Tex. Code Crim. Proc. Ann. art. 38.37 §§ 1(b), 2(b) (West Supp. 2016).

of extraneous offenses? The majority considers, as part of its analysis, the fact that the extraneous offense evidence was admissible under the Code. Tex. Code Crim. Proc. Ann. art. 38.37 (West Supp. 2016). This fact is, I believe, irrelevant to the election harm analysis, at least in this case, because the evidence was admitted during the State's case, before the time to require an election. Next, the majority recognizes that the trial court gave a limiting instruction. As just discussed, a limiting instruction is the "protection" contemplated by the first purpose. Whether the limiting instruction was actually effective, that is, whether the jury properly did not give the extraneous offense evidence undue significance, is unknown. Absent evidence to indicate otherwise, an appellate court should assume that the jury was able to follow instructions and that it did so. Based on Texas law, the first purpose was not impaired.

## II - Risk of a Conviction Not Proved Beyond a Reasonable Doubt

The second purpose behind the election requirement is concerned with the possibility that a jury, when faced with evidence of multiple offenses, could unanimously conclude that none of the offenses were proved beyond a reasonable doubt, but the evidence of all of the offenses justifies conviction anyway. *Phillips*, 193 S.W.3d at 910 n.27 ("The jury may have taken both [offenses] into account, and have considered that one or the other was not sufficiently made out to warrant a conviction, but that both together convinced [it] of the guilt of the defendant . . . .") (quoting *Fisher v. State*, 33 Tex. 792, 794 (Tex. 1870)).

In my view, the risk is minimal that Appellant was convicted because the jury was convinced that he was generally guilty of the great multitude of offenses while at the same time not guilty of one beyond a reasonable doubt. This is so because the evidence of each separate incident appears to be enough to convince a jury that Appellant was guilty of the offense beyond a reasonable doubt.

First, regarding the first "incident," which the majority fairly considers to be many undifferentiated offenses,[2] the evidence showed that Appellant committed aggravated sexual assault of a child as indicted, by causing K.M.'s sexual organ to contact his own sexual organ. K.M. testified in great detail about how the room was laid out and the general pattern of abuse committed by Appellant. According to K.M.'s testimony, Appellant would put her in the closet, take her clothes off, and then pick her up and put her on the bed. She would cry and tell him to stop, but Appellant would nevertheless get on top of her and stick his penis in her vagina. In my opinion, this testimony is more than enough to get a jury to find the first offense proved beyond a reasonable doubt.

Second, the evidence of the incident with the added oral assault was itself enough to convince a jury that Appellant was guilty beyond a reasonable doubt. K.M. testified that this incident occurred in Appellant's and K.M.'s grandmother's room, just as with the undifferentiated assaults. She then explained that the "same thing" happened that Appellant did the first time (referring to the "first incident" of undifferentiated assaults), but this time he had K.M. put her mouth on Appellant's penis. K.M. testified that this happened after Appellant had put his penis inside of her. Just as with the first undifferentiated offenses, the evidence of the second incident appears to be enough to convince a jury that Appellant was guilty of the offense beyond a reasonable doubt.

Third, the evidence of the incident in Tyler's room appears to be enough to convince a jury

---

[2] I do not fault the court of appeals for finding that the "first incident" was a single, discrete instance. K.M.'s testimony about the general pattern was in response to the State's question:

> Q. Okay. So, we talked about the abuse. I want to think back right now in your mind of *a specific incident that you remember the best*; and we'll start there, okay? Okay. Where were you when that happened?

Rep. R. vol. 4, 18 (emphasis added).

that Appellant was guilty of the offense beyond a reasonable doubt. K.M. testified that she was in her uncle's room, watching a movie, and it was dark outside. She testified that Appellant came in and did "both things" to her, referring back to her testimony of the vaginal and oral assault from second incident. She explained that Appellant took his clothes off, got on top of her, and put his penis in her vagina and then he put his penis in her mouth. Like the evidence of the second incident, and the evidence of the first incident, the evidence of the third incident appears to be enough to convince the jury that Appellant was guilty of the offense beyond a reasonable doubt.

Finally, the evidence of the incident at Appellant's father's house appears to be enough to convince a jury that Appellant was guilty. K.M. testified in detail about an incident where Appellant said he was going to take her to an arcade, but instead of taking her to the arcade he took her to his father's home. While there, Appellant showed K.M. around the house until he finally took her into his bedroom there, where he again stuck his penis in K.M.'s vagina and then put her mouth on his penis.

Accordingly, I believe that the evidence as to each of the "four" incidents appears to be enough to convince the jury Appellant was guilty beyond a reasonable doubt. I see no risk that the jury decided to convict Appellant simply because the jury was convinced that he was generally guilty due to the evidence of all the offenses, but was not convinced that Appellant was guilty of any specific offense beyond a reasonable doubt.

### III - Danger of a Non-Unanimous Verdict

The third purpose is concerned with the possibility that a portion of the jury may have found the defendant guilty of one offense, while another portion of the jury may have found the defendant guilty of a different offense. If this occurs, the jury is not unanimous about a specific offense, and

the defendant's right to a unanimous verdict would be violated.

Considering the third purpose, the majority is correct in finding that "[t]here is no basis anywhere in the record for the jury to believe that one incident occurred and another did not." However, the majority opinion goes on to say "[e]ither they all did or they all did not." I am concerned with the phrasing used by the majority opinion, and I think that the blanket statement that the jury must either believe that all of the incidents occurred or none of them occurred deserves some further explanation. Of course, it is possible that a jury might decide that a witness's credibility is an all or nothing question. "We think the witness is credible, so we believe everything he said." But a jury could decide that a witness's credibility is nuanced and not subject to a general determination. "We think the witness was credible when he was discussing his background, training, and experience, but we think he was not credible when he was explaining his actions on the day in question." *See Sharp v. State*, 707 S.W.2d 611, 614 (Tex. Crim. App. 1986) ("The jury, being the judges of the facts and credibility of the witnesses, could choose to believe or not believe the witnesses, or any portion of their testimony.") (citing *Esquivel v. State*, 506 S.W.2d 613, 615 (Tex. Crim. App. 1974)).

Again, the majority is correct in finding that there is no basis in the record for the jury to believe that one incident occurred and another did not. But it is because of that silence in the record that we entrust questions of credibility and demeanor to the jury. *Meekins v. State*, 340 S.W.3d 454, 461 n.32 (Tex. Crim. App. 2011) ("Determinations of witness credibility are left entirely to the fact finder, who is in the unique position to observe the witness' body language, demeanor, tone of voice, and other indicia of credibility."); *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). While appellate records contain *what* a witness said, they almost universally never contain *how* the witness said it.

A witness may be nervous, a witness may be visibly sweaty, a witness may testify in an uncharacteristically robotic and rehearsed fashion, a witness may make small hints through body language. These things may be present throughout the witness's time on the stand. They may be present only during particular lines of questioning. All of these things can affect a jury's impression of the witness, but rarely do they make it into the record to be seen by us or the courts of appeals.

The testimony in this case, unlike in *Dixon*, was not almost entirely composed of undifferentiated and unspecific incidents. While the majority fairly construes the first incident as many indistinguishable incidents, there were also three specific incidents as well. The testimony about the undifferentiated incidents may have been more or less credible than the testimony about the incident where oral contact was added, the vaginal and oral incident in Tyler's room, or the vaginal and oral incident at Appellant's father's home. And the testimony about any of those three incidents may have been more or less credible than the others. That being said, by its guilty verdict the jury must have found K.M. to be credible. And absent any indication to the contrary, I agree with the majority that, in this case at least, there is no cause to find that the jury found one part of K.M.'s testimony more or less believable than another.

That brings me back to the unanimity concern. For the second incident involving added oral contact, I believe there is no danger that some members of the jury decided to convict Appellant on only the second incident while other jurors decided to convict him on any of the others, especially the first. The oral assault was brought up early in the State's closing argument:

> [K.M.], [K.M.], this intelligent, sweet, good kid, gets up there; and she tells you just exactly the kind of hell that she was living through from the ages of five up until eight. And I know you had it, but at one point in her testimony, you felt it in your gut, you knew it. You knew that you believed her. And maybe it was that moment when she got up there and you heard about all the things that she loved and

then that change in her emotion the second that I turned her attention to that 2009 first incident. Or maybe it was that moment when she recalled with such specificity just exactly what her little body was doing when that man put his penis inside of her. She told you, I was laying there; I was stiff. What a vivid detail for a six year old to have to go through, experience when you're involved in unwanted sexual contact. And she tells you that her body was stiff when that was happening.

Or maybe that moment came for you in your gut when you got to hear about her basically reliving an event that occurred, and you heard from Lisa Holcomb in that interview and she did it for you here today or yesterday, too, when she was demonstrating for you just exactly how he grabbed her head when he forced her mouth on his penis. She was reliving that moment.

So, when you knew it in your gut and you knew that you believed her then, right then and there, that's guilty.

Rep. R. vol. 5, 75. While this reference in the State's closing argument may have revived a particularly vivid moment during K.M.'s testimony for the jury, the risk that the reference led some jurors to find Appellant guilty of the second incident, but not the others, is slight. The main thrust of the State's argument was directed toward the general pattern of abuse encapsulated in the "first" incident. The reference to K.M.'s testimony about the second incident was not to highlight the incident itself as an offense for the jury to consider guilt or innocence on, but for the purpose of emphasizing K.M.'s credibility, that her testimony was coming from reliving the abuse. Therefore, I do not believe that there was a danger that some members of the jury found Appellant guilty of the second incident but not the first.

For the third incident, there is no danger that some members of the jury decided to convict Appellant on the incident in Tyler's room but not the other incidents. The State just briefly mentioned Tyler in its closing argument to address a possible concern that the jury believed K.M.'s testimony but may have wanted to hear testimony from Tyler for corroboration. The State's argument clearly was not putting emphasis on the incident in Tyler's room. Instead, it was intended to encourage the jury to follow its instinct to believe K.M.'s testimony without requiring corroboration.

No members of the jury could have taken the brief mention of Tyler as a sign that the incident in Tyler's room is what they should be focusing on in deliberations.

For the fourth incident, where K.M. testified that Appellant said he was going to take her to an arcade (It'z) but instead took her to his father's home where he again assaulted her, there is also no danger that some members of the jury found Appellant guilty of this offense but not the others. The only place in the State's closing argument where that incident was brought up went as follows:

> Let's talk about the Defendant's testimony. He agreed to a lot. I mean, the elements that are before you, he agreed to all of them, he just said there wasn't any sexual contact between the two of them. And you know what else he agreed to just about every single thing that's come across that stand. He told you about the locked doors, the nighties. He tells you about the last excursion out with [K.M.]. He just wants you to believe that nothing was going on during that time.
>
> And what are the reasons why he wants you to believe that? He wants to tell you, well, she was locking the door. It was irritating to me, but I just let her do it anyway. And she would model for me the clothes that she would put on back there. And what else would he say about that trip to It'z? Well, I didn't feel like it was necessary to actually tell her mom where I was taking her. I just took her to all these different places because I wanted to spend one last time with her.
>
> So when you think about all the things that he said and he can't even come up with a reason as to why she would lie or who's doing it for or anything like that, and you know that he has every reason in the world to tell you that he didn't do it and you know that you can't trust a word that he has to say. Because at the end of the day, though, when you look at all the pieces and you put it all together, the Defense wants you to just brush this off as coincidences. And yet we have this mountain of coincidences that they need you to suspend reality about and pretend are not occurring.

Rep. R. vol. 5, 85-86. Clearly, the State's closing argument only brought up the incident for a short moment, and the State did not emphasize it as an offense for the jury to consider Appellant's guilt or innocence. It was only brought in as part of the State's argument that Appellant's testimony and reasons should not be believed. Thus, there is no danger that any members of the jury would take this reference as a sign to consider Appellant's guilt on the incident at Appellant's father's house but not

the first undifferentiated offenses.

Accordingly, I am convinced, beyond a reasonable doubt, that the failure to require the State to elect did not endanger Appellant's right to a unanimous verdict.

### IV - Notice and Opportunity to Defend

Finally, the fourth purpose of the election requirement is to afford a defendant a fair opportunity to challenge the State's case. Defensive efforts must be focused, and if the defendant is unable to determine which offense the State is proceeding upon, he must defend against all of the offenses, to the detriment of his defense to the actual incident. Most defendants have limited resources in time, money, or manpower for a proper investigation. Without the State's election, a defendant might be confronted with fifty or more offenses, and, so confronted, he might disprove forty-nine yet still be convicted of the fiftieth offense. *Crosslin*, 235 S.W. at 906. Thus, the election requirement seeks to prevent a situation that would embarrass the accused by leaving him in doubt as against which offense he will be called upon to defend. *Id.*; *O'Neal*, 746 S.W.2d at 772. However, in the event that the State's proof and theory all point to a particular incident, a defendant may be put on notice which offense the State was relying upon, without an actual election. *O'Neal*, 746 S.W.2d at 772-73. In such cases, the defendant would not be embarrassed by being left in doubt as to which offense he would be called upon to defend. *Id.*

In this case, Appellant's defense was that nothing sexual happened between K.M. and himself, and K.M.'s outcry was the result of repeated questioning by his ex-wife. Of course, if the State had elected a particular offense, whether it was the undifferentiated incidents, the incident where oral was added, the incident in Tyler's room, or the incident at Appellant's father's home, Appellant could have sought to recall K.M. as a witness and focused a re-examination of K.M. on

that particular instance. Perhaps he could have drawn out inconsistencies by repeated questioning. While any such inconsistencies might undermine K.M.'s credibility, said inconsistencies would not constitute a change in Appellant's defensive theory of the case that nothing sexual happened at all and that K.M.'s outcry was a fabrication. Furthermore, to what extent, if any, the election followed by a more extensive cross-examination of K.M. might undermine K.M.'s credibility would be highly speculative. Even if we felt the need to speculate as to this matter, we are restricted to do so based on the record before us, and there is nothing in the record concerning any of the offenses that would lead me to believe that a more extensive cross-examination on any particular offense would undermine K.M.'s credibility enough to create reasonable doubt as to that particular offense. For this reason and because of the nature of Appellant's defense, it was not prejudiced by the failure to require the State to elect. Unlike a case where a defendant, faced with evidence of multiple offenses, may be able to marshal an alibi for some of the offenses and justifications and affirmative defenses for other offenses, Appellant's defense here was a blanket denial of wrongdoing. It seems obvious that the defense would have been the same even if the State elected any of the four incidents. I believe Appellant was not denied an adequate opportunity to defend himself against the charged offense.

## V - Continuing Offense

As Judge Cochran recognized in her concurring opinion in *Dixon*, our bedrock procedural protections are not designed for situations such as the case before us involving generic, undifferentiated, ongoing acts of sexual abuse of young children. *Dixon*, 201 S.W.3d at 737. Penal statutes, such as the aggravated sexual assault statute involved in this case, are intended to criminalize "one discrete criminal offense at one discrete moment in time." *Id.* She suggested that

the Legislature enact a statute focusing upon a sexually abusive relationship that is marked by a pattern or course of conduct of various sexual acts. *Id.* The Legislature responded by enacting section 21.02 of the Penal Code, criminalizing continuous sexual abuse of a young child or children. Act of June 15, 2007, 80th Leg., R.S., ch. 593, § 1.17, 2007 Tex. Gen. Laws 1120, 1127 (current version at Tex. Penal Code Ann. § 21.02 (West 2011 & Supp. 2016)). The statute was designed for cases like this one, and if Appellant was charged under the statute, the issue involving election of offenses before the Court today would have been avoided.

  With those thoughts, I join the majority opinion in this case.

Filed: November 1, 2017
Publish